## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Yabesh Maroko,

        Plaintiff,

                                  Civ. No. 10-63 (RHK/JJG)
                                  **MEMORANDUM OPINION**
                                  **AND ORDER**

v.

Werner Enterprises, Inc.,

        Defendant.

Stephen A. Melcher, Fabyanske, Westra, Hart & Thomson, P.A., Minneapolis, Minnesota, Khanh Ngoc Nguyen, Philip F. Fishman, Fishman Binsfield & Bachmeier, PA, Bloomington, Minnesota, for Plaintiff.

Laura J. McKnight, Mark R. Bradford, Bassford Remele, PA, Minneapolis, Minnesota, for Defendant.

### INTRODUCTION

Plaintiff Yabesh Maroko is a Seventh-Day Adventist. His religious beliefs prevent him from working on the Sabbath, from sundown Friday to sundown Saturday. He was employed by Defendant Werner Enterprises, Inc. ("Werner") as a delivery-truck driver in 2006, but Werner terminated his employment after he refused Sabbath work; he later commenced the instant action, alleging discrimination. Werner now moves for summary judgment. For the reasons set forth below, the Court will deny its Motion.

BACKGROUND

Viewed in the light most favorable to Maroko, see Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000), the relevant facts are as follows. Maroko is a Kenya native who emigrated to Minnesota in 1999. (Maroko Aff. ¶ 2.) He is a devout Seventh-Day Adventist. (Id. ¶ 3.) A fundamental tenet of his religion is that work on the Sabbath is prohibited. (Id.)

In 2006, on the recommendation of a friend, Maroko enrolled in school in Eagan, Minnesota, to become a truck driver. (Maroko Dep. at 24-25, 69-70.) While there, a Werner recruiter visited the school to speak to students about working for the company when their schooling ended. (Maroko Aff. ¶ 4.)[1] Maroko was interested, so he informed the recruiter about his inability to work on the Sabbath – the recruiter assured him it would not present a problem and could be accommodated. (Id.)

Maroko completed his schooling in July 2006 and received a commercial driver's license. (Maroko Dep. at 24, 69-70.) A short time later, Werner hired him as a "student driver." (Id. at 73-74; Maroko Aff. ¶ 5.) The first step in his training was to spend three days at Werner's Nebraska headquarters learning the "Qualcomm system," which was a GPS-based communication and logging system in each of Werner's trucks. (Id.) There, he informed two managers of his Sabbath-work restriction. (Melcher Aff. Ex. A; Maroko Dep. at 66-69, 73-74.) The restriction was documented in an August 10, 2006, notation

---

[1] Neither party has informed the Court the precise nature of Werner's business. Its website discloses that it "is a premier transportation and logistics company" that is "among the five largest truckload carriers in the United States," including "dedicated, medium-to-long-haul, regional and local van capacity, expedited, temperature-controlled and flatbed services." http://www.werner.com/content/about/ (last visited April 13, 2011). Its fleet consists of more than 7,300 tractors and 25,000 trailers. Id.

in his employment file: "religion requires that he worship on [S]aturdays ([F]riday at sunset to [S]aturday at sunset) prefers to be out of truck." (Melcher Aff. ¶ 2 & Ex. A.) The managers in Nebraska assured Maroko that his religious beliefs could be accommodated. (Maroko Aff. ¶ 5; Maroko Dep. at 66-69.)

After completing the Qualcomm training, Maroko participated in three months of driving training. (Maroko Dep. at 75.) That training was directed from Werner's Tomah, Wisconsin distribution center, which provided dedicated delivery services to Wal-Mart across eight Midwestern states and was the account to which Maroko ultimately would be assigned (the "Tomah Account"). (Kriutzfeld Dep. at 9; McKeel Dep. at 7, 30-31; Maroko Dep. at 75, 85; McKeel Decl. ¶ 3.) During those three months, Maroko was paired with another driver, a "trainer," and together they made deliveries to various Wal-Mart locations, at all hours of the day. (Maroko Dep. at 75, 83.) Lance McKeel, the "dedicated manager" on the Tomah Account, was able to accommodate Maroko's Sabbath restriction during this training period because he was paired with a trainer – McKeel arranged for any deliveries on the Sabbath to be made by the trainer rather than Maroko. (Maroko Dep. at 75-76; McKeel Decl. ¶ 5.)[2]

Shortly before his training ended, Maroko spoke with McKeel in Tomah. In that conversation, McKeel informed him that Werner could not accommodate him on the Tomah Account, because Friday night and Saturday were the busiest times of the week for Wal-Mart deliveries, which meant that all drivers had to be working. (Maroko Dep.

---

[2] As the "dedicated manager," McKeel had overall responsibility for the Tomah Account. (McKeel Dep. at 12-13.) The "fleet managers," who handled driver assignments (among other things), reported to him. (Id. at 12; Kriutzfeld Dep. at 8, 15-18; Doverspike Dep. at 8.)

at 79-81; Maroko Aff. ¶ 8; McKeel Dep. at 53-54; McKeel Decl. ¶¶ 3, 6.) Maroko was "shock[ed]," as Werner "had previously assured [him] that [his] Sabbath restriction would be accommodated." (Maroko Aff. ¶ 8.)

Maroko successfully completed Werner's training program and "qualified" as a truck driver shortly thereafter. (Maroko Aff. ¶ 9.) He then returned to Nebraska for additional Qualcomm training and once again asked his manager there whether he would be accommodated on the Tomah Account; he received assurance that he would. (Id. ¶ 10; Maroko Dep. at 86, 98.) Werner then gave him a truck, and he drove to his home in Minnesota to await delivery assignments from Tomah. (Maroko Aff. ¶ 11; Maroko Dep. at 86; McKeel Decl. ¶ 6.)

After returning to Minnesota, Maroko called the fleet managers in Tomah numerous times between November 5 and November 8, 2006, in order to receive his delivery assignments. (Maroko Dep. at 86-87; Maroko Aff. ¶¶ 11-13.) A manager named "Robert" advised that Werner had assigned him no deliveries because it could not accommodate his Sabbath-work restriction and reiterated that he needed to work Saturdays on the Tomah Account. (Maroko Dep. at 87, 91-92, 95; Maroko Aff. ¶¶ 11, 13.)[3] As a result, on November 9, 2006, Maroko faxed a letter to Werner's headquarters, asking to be told in writing

> that you don't have anything for me whereby I can keep the Sabbath (from sunset Friday – Saturday sunset) as you have always said to me. Robert fleet manager – Tomah told me on [the] phone that he talked to supervisor

---

[3] Robert Doverspike was a fleet manager on the Tomah Account during the relevant time period. (Doverspike Dep. at 5, 8.) In his deposition, however, Doverspike could not recall ever speaking with Maroko by phone. (Id. at 12-13.)

>   Lance McKeel and told him that they cannot allow me [to] keep the Sabbath.

(Maroko Aff. ¶ 14 & Ex. A; see also Maroko Dep. at 88-92.) He received no response. (Maroko Aff. ¶ 14; Maroko Dep. at 90-93.) On November 15, 2006, Maroko faxed Werner a second letter, reiterating that he could not "change [his] mind by working [his] day of rest from sunset Friday to Saturday sunset" and inquiring how to proceed. (Maroko Aff. ¶ 15 & Ex. B.) Once again, Werner did not respond. (Maroko Aff. ¶ 15; Maroko Dep. at 95-96.)

Five days later, Maroko faxed Werner a third letter. (Maroko Aff. ¶ 16 & Ex. C.) He again informed the company that he was "ready to work with you if you'll give me my day of rest sunset Friday to sunset Saturday." (Maroko Aff. Ex. C.) He further informed Werner that he had moved the truck to a local Sam's Club parking lot, because the police had ordered him to remove it from his driveway. (Id.; Maroko Dep. at 87; Maroko Aff. ¶ 16.) He asked Werner what he should do with the truck if it did not plan to accommodate his Sabbath-work restriction. (Maroko Aff. Ex. C.) Werner did not respond. (Maroko Aff. ¶ 16.)

On November 20, 2006, Maroko went to the Sam's club parking lot and discovered that the truck was gone. (Id. ¶ 17; Maroko Dep. at 98-99.) He called police, fearing the truck had been stolen, and then contacted the Tomah distribution center. (Maroko Aff. ¶ 17; Maroko Dep. at 99.) He was informed that Werner had retrieved the truck, having concluded that he had "voluntarily quit" his position. (Maroko Dep. at 99-

101; Hoffman Dec. ¶ 9; McKeel Decl. ¶ 12.) Maroko had no further contact with Werner after November 20, 2006. (Maroko Dep. at 100.)

After exhausting his administrative remedies, Maroko commenced this action against Werner in January 2010, alleging that it had failed to accommodate his religious beliefs in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* He later amended his Complaint, asserting the same claims but adding (with leave of Court) a request for punitive damages. (See Doc. No. 51.) With discovery now complete, Werner moves for summary judgment.[4]

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Graves, 229 F.3d at 723; Calvit v. Minneapolis Pub.

---

[4] In both the Complaint and the Amended Complaint, Maroko also asserted a *reprisal* claim under the MHRA, alleging that after informing Werner of his need to take off the Sabbath, the company immediately terminated his employment. (See Compl. ¶¶ 32-36; Am. Compl. ¶¶ 32-36.) But in the Court's view, an employee's termination after informing his employer of a religious belief is functionally equivalent to the employer's failure to accommodate that belief. Accordingly, and because the parties have not mentioned this claim, the Court believes it need not be separately addressed herein.

Schs., 122 F.3d 1112, 1116 (8th Cir. 1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

### I. Religious discrimination generally

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise discriminate against any individual with respect to his . . . terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "Religion" includes "all aspects of religious observance and practice," unless an employer "demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the . . . employer's business." 42 U.S.C. § 2000e(j). In this "awkward" way, the statute makes it unlawful for an employer not to make reasonable accommodations for an employee's religious practices, unless doing so would impose an undue hardship. Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 & n.1 (1986).[5]

---

[5] Unlike Title VII, the MHRA does not define the term "religion," including its "reasonably accommodate" language. Werner argues, therefore, that the MHRA "does not recognize failure to accommodate claims in the context of religious discrimination." (Def. Mem. at 9 n.5.) The Minnesota Court of Appeals, however, has held that the MHRA does indeed require employers to reasonably accommodate their employees' religious beliefs. See, e.g., Benjamin v. Cnty. of Hennepin, No. C8-96-1122, 1996 WL 679690, at *3 (Minn. Ct. App. Nov. 26, 1996). Accordingly, Maroko may press his claim under both state and federal law. The presence of the state-law claim, however, does not alter the Court's analysis. See Sigurdson v. Isanti Cnty., 386 N.W.2d 715, 719 (Minn. 1986) (analysis of MHRA claims parallels analysis of Title VII claims); Benjamin, 1996 WL 679690, at *3 (citing Title VII cases when considering failure-to-accommodate claim).

To establish a *prima facie* case of religious discrimination for failure to accommodate, a plaintiff must show that he (1) has a bona fide religious belief that conflicts with an employment requirement, (2) informed the employer of this belief, and (3) was disciplined for failing to comply with the conflicting requirement. E.g., Jones v. TEK Indus., Inc., 319 F.3d 355, 359 (8th Cir. 2003); Wilson v. U.S. W. Commc'ns, 58 F.3d 1337, 1340 (8th Cir. 1995). If the plaintiff establishes a *prima facie* case, the burden shifts to the employer to show that it offered the plaintiff a reasonable accommodation, Wilson, 58 F.3d at 1340, or that accommodating the plaintiff would result in an undue hardship, Seaworth v. Pearson, 203 F.3d 1056, 1057 (8th Cir. 2000) (*per curiam*). See also Harrell v. Donahue, __ F.3d __, 2011 WL 1166670, at *3 (8th Cir. Mar. 31, 2011).

## II.   The *prima facie* case

Werner does not dispute the first two elements of Maroko's *prima facie* case, namely, (1) a sincere religious belief (no Sabbath work) (2) that was communicated to it. (See Def. Mem. at 9.) It argues, however, that Maroko cannot establish element (3) because "the record shows that he voluntarily abandoned his job." (Id.) The Court does not agree.

At the outset, it is disingenuous for Werner to argue that Maroko abandoned his job when it was *the company* that decided not to assign him any work. It is not as though Werner offered Maroko assignments on non-Sabbath days, but he opted not to undertake them. Rather, Werner told him it could not accommodate him on the Tomah Account (McKeel Decl. ¶¶ 6-7), and therefore it did not assign him any deliveries. This is hardly "abandonment."

But regardless, even if Maroko had somehow "abandoned" his job, the facts show that it was because Werner told him it could not accommodate his religious beliefs. (See Melcher Aff. Ex. E (indicating that Maroko's employment ended because he "need[ed] off Friday night but all Wal[m]art drivers are needed Friday and he can't do that").) Put another way, the Sabbath-work requirement was the proximate cause of the termination of Maroko's employment. That is sufficient to establish the third element of his *prima facie* case. Sturgill v. United Parcel Serv., Inc., 512 F.3d 1024, 1034 (8th Cir. 2008); see also Jones, 319 F.3d at 359 (*prima facie* case established where employee shows his employment ended because he failed to comply with a "conflicting requirement of employment").[6]

### III. Offer of a reasonable accommodation

With a *prima facie* case established, the burden shifts to Werner to show that it offered Maroko a reasonable accommodation or could not do so without undue hardship. E.g., Harrell, 2011 WL 1166670, at *3. Werner contends that it offered Maroko a reasonable accommodation by offering to assign him to a "NetOp" route, although no such position was available at the time.[7] Until a "NetOp" position opened, Werner

---

[6] Werner argues that Maroko's "abandonment" is evidenced by the fact that he repeatedly "declined to return telephone calls from his account supervisors" in Tomah. (Def. Mem. at 10.) But the record is unclear whether, or how often, supervisors actually attempted to contact him. Indeed, he has submitted his telephone records – both landline and cell-phone – to the Court, and those records, while somewhat ambiguous, do not appear to establish repeated attempts to contact him during the period in question. (See Melcher Aff. Exs. D-E.)

[7] A "NetOp" (or "Network Optimization") route "utilize[s] drivers in specific locations to drive approximately 250 miles, meet another . . . driver, and return to the driver's original location with a different load." (Hoffman Decl. ¶ 4.) In other words, "drivers combine to haul a single load, with no driver hauling the load more than 250 miles." (Id.) Drivers prefer NetOp routes

purportedly gave Maroko a choice: either work on the Sabbath, or take a 30-day leave of absence, in the hope that a position would open in that timeframe. (Hoffman Decl. ¶ 8; McKeel Decl. ¶ 6.) The Court perceives two problems with Werner's argument.

### A.     Was there an offer?

First, the record reveals a fact dispute whether Werner actually offered the proposed accommodation to Maroko.

Werner points to several documents to argue it is "undisputed" that it did so. (Def. Mem. at 11-12.) For example, Kristina Hoffman, Werner's Assistant Director of Human Resources, has attached to her Declaration a memorandum dated November 13, 2006, memorializing a conversation she (allegedly) had with Maroko earlier that day. The memorandum states, "I called Yabesh. . . . I said he had two options: 1. drive until we could put him on a net op lane [or] 2. go on a 30-day leave and have his name on a waiting list for the net op lane." (Hoffman Decl. Ex. 2.) She also has submitted an e-mail she sent to the individual responsible for the NetOp waiting list, Kerri Stege, asking Stege to add Maroko to the list. (Id. Ex. 1.) Similarly, McKeel, the "dedicated manager" on the Tomah Account, has submitted an e-mail he sent to Doverspike, one of the fleet managers who supervised Maroko. In that e-mail, McKeel told Doverspike to contact Maroko because "we need to get him on [a leave of absence] till an opening comes at net ops." (McKeel Decl. Ex. 1.) These documents appear to substantiate Werner's claim that it offered an accommodation to Maroko.

---

because they provide a more regular schedule and allow them to be home more frequently, and hence there is usually a waiting list for these positions. (Id. ¶ 5.)

Yet, Maroko has submitted evidence undermining that assertion. For instance, he has submitted an Affidavit in which he expressly denies receiving "any offer of any accommodation from Werner . . . on the Tomah Account or any other account." (Maroko Aff. ¶ 21.) He testified consistently at his deposition, denying that either McKeel or Hoffman offered him a NetOp route or any other accommodation:

> Q. Did Mr. McKeel tell you that he would try to find a different position for you to see if there were some positions open that could accommodate your request not to work on your Sabbath?
>
> A. *No. He never said that.* I don't remember him saying that to me.
>
> Q. That's slightly different. . . . You said that you don't remember him saying that to you, correct?
>
> A. Yes.
>
> Q: Which means that he may have said that, but –
>
> A. *No.*
>
> Q. So you are –
>
> A. *I'm certain, because as far as he's concerned, what I remember clearly he could not make provisions for me, accommodate me.*

(Maroko Dep. at 81-82 (emphases added).)

> Q. Do you deny that you had communication with Christina Hoffman or anyone else in the director of human resources? Excuse me. In the Human Resources Department.
>
> A. I don't remember talking to anybody.
>
> Q. You deny –
>
> A. Deny what? *I never talked to that person. I never talked to that person.*

(Id. at 83-84 (emphasis added).)

> Q. Do you recall having phone conversations with Christina Hoffman?
>
> A. How many times do you ask that question? How many times?
>
> Q. Do you deny having a conversation with –
> A. The answer is no.
>
> Q. Please let me ask the question. Do you deny having a conversation with anybody at Werner where they told you [that] you had two options, to drive until a different route other than the Tomah route opened up or to go on a 30-day leave and have your name be put on a waiting list for a different route?
>
> A. *No. I could just comment and say that's made up stuff.*

(Id. at 96-97 (emphasis added).) In addition, Maroko's telephone records do not show that he received a call from Hoffman (who worked at Werner's Nebraska headquarters) on November 13, 2006, as her memorandum indicates.[8]

Werner largely ignores Maroko's evidence in its Motion papers, disregarding the above deposition testimony and dismissing his Affidavit as "self-serving." (Reply at 3 n.1.)[9] But at bottom, the record suggests that whether Werner did, in fact, offer an

---

[8] Although the records reveal no call from Nebraska that day, they do show that Maroko received a call at 3:18 p.m. from "NBR Unavail," presumably meaning "number unavailable." At oral argument, Werner's counsel asserted that this call was made by Hoffman, but she conceded that Werner lacks phone records to support that assertion. Moreover, Hoffman has nowhere averred in her Declaration that she placed this particular call. Simply put, it is impossible for the Court to discern whether this call came from Hoffman.

[9] Affidavits submitted by plaintiffs are inherently "self-serving," for why else submit them? See SEC v. Phan, 500 F.3d 895, 909 (9th Cir. 2007); see also Moore v. Indehar, 514 F.3d 756, 766 (8th Cir. 2008) (Beam, J., dissenting) ("Of course Indehar's words are self-serving[,] as are the testimonial words of virtually any party to any litigation."). But this does not mean they cannot be considered at summary judgment. See, e.g., Sitzes v. City of W. Memphis, Ark., 606 F.3d 461, 469-70 (8th Cir. 2010) (no error in considering self-serving affidavit); Moore, 514 F.3d at 766 (Beam, J., dissenting) ("[S]elf-serving words are not untruthful or second-class words."); Cadle Co. v. Hayes, 116 F.3d 957, 961 (1st Cir. 1997) ("[A] party's own affidavit, containing

accommodation to Maroko is in dispute. While a jury ultimately might not accept his claim that no offer was made, particularly in light of the documents Werner has proffered, at summary judgment the Court may not simply ignore his evidence. Summary judgment is inappropriate under these circumstances.

Werner argues that even if Maroko were correct that it failed to offer him an accommodation, it still prevails because he "would have rejected" its offer anyway. (Reply at 3-4.) Yet, Werner has cited no case suggesting that an employer need not offer an accommodation when it believes – correctly or incorrectly – the employee will reject it. Indeed, such a rule would be antithetical to the purpose behind the accommodation requirement, which is to "foster bilateral cooperation in resolving an employee's religion-work conflict." Sturgill, 512 F.3d at 1031. "Bilateral cooperation" cannot get off the ground if the employer does not offer *some* accommodation to the employee in the first instance. See Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1488-89 (10th Cir. 1989) ("[T]he statutory burden to accommodate rests with the employer, and the employee's duty to make a good faith attempt to satisfy his needs through means offered by the employer *is irrelevant until the employer satisfies its initial obligation under the statute*.") (emphasis added); EEOC v. IBP, Inc., 824 F. Supp. 147, 154 (C.D. Ill. 1993) ("Title VII places the obligation upon the employer to initiate an accommodation.").

---

relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment."). Werner argues, however, that Maroko's Affidavit should not be considered here because it contradicts his deposition testimony, in which he (supposedly) (1) did not deny that Werner offered him an accommodation and (2) "stated that he could not deny Ms. Hoffman's call communicating the offer of accommodation took place." (Reply at 3 n.1.) This is simply untrue, as a quick review of the deposition testimony set forth above makes clear. The Affidavit does not contradict the deposition.

### B.     Was the "offered" accommodation reasonable?

Second, even if Werner had offered Maroko the accommodation discussed above, the Court finds a genuine issue whether that accommodation was "reasonable."

An "employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear, but the reach of that obligation has never been spelled out by Congress or by EEOC guidelines." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 75 (1977). Accordingly, the "unanimous weight of authority" indicates that the "reasonableness of any given accommodation is a fact-intensive inquiry that depends on the totality of the circumstances." Haliye v. Celestica Corp., 717 F. Supp. 2d 873, 878 (D. Minn. 2010) (Schiltz, J.).

Here, Werner supposedly gave Maroko two choices: continue working on the Sabbath, or take a 30-day leave of absence, until a NetOp position opened. The first choice would have done nothing to eliminate the conflict between Maroko's religious beliefs and his Sabbath work requirement, at least until a new position came available. While the Eighth Circuit has held that an accommodation need not *always* eliminate a religion/work conflict in order to be "reasonable," in some instances it may be necessary. See Sturgill, 512 F.3d at 1032-33 ("To be sure, there may be many situations in which the only reasonable accommodation is to eliminate the religious conflict altogether."). And the evidence before the Court discloses that other alternatives, which would have eliminated the religion/work conflict, were available to Werner at the time it (supposedly) offered its proposed accommodation. In particular, it could have transferred Maroko to

its "van division," which indisputably could have accommodated the Sabbath-work restriction and which had open positions at the time. (McKeel Dep. at 74-76; Kriutzfeld Dep. at 9-10.) Other Werner accounts (besides the van division) also could have accommodated that restriction. (See Melcher Aff. Ex. F, No. 10.)[10] And as Werner acknowledges, "lateral transfer[s] and job change[s]" such as these typically are considered reasonable accommodations. (Def. Mem. at 10 (citing 29 C.F.R. § 1605.2(d)(1)(iii)).)

Werner responds that Maroko demanded to work only on the Tomah Account and would not have accepted a position in the van division or anywhere else requiring him to be away from home on the Sabbath. (See Reply at 10 (Maroko "unequivocally testified in his deposition that he sought a position that would have allowed him to remain in Minneapolis").) The record flatly contradicts this assertion, however. Indeed, Maroko testified that although he *preferred* something close to the Twin Cities, he would have accepted "any other [position] open to work," including for example "an option that maybe [would require him to] to go New York," but no such offer from Werner ever came. (Maroko Dep. at 85-86; accord Maroko Aff. ¶ 22.) Werner also points to the deposition of Elliott Kriutzfeld, a Tomah fleet manager, who supposedly "testified that Maroko was not interested in a . . . van[] position, and was insistent that he simply be allowed to stay on the Tomah account." (Reply at 10.) Once again, this assertion is

---

[10] Werner claims there were no openings on these other accounts, citing its answers to Maroko's Interrogatories. (Reply at 10.) Those answers, however, indicate that the other accounts had no open positions "*that Plaintiff was willing to accept*" (Melcher Aff. Ex. F, No. 11 (emphasis added)), apparently because Maroko "refused" to work on any account other than the Tomah Account. As discussed in more detail below, ample evidence exists to refute that contention.

belied by the record. While Kriutzfeld *initially* testified to this effect, he later clarified that Maroko sought work "[o]n *any* account with the Sabbath off, *not necessarily the Tomah account*." (Kriutzfeld Dep. at 43 (emphases added); accord id. at 44 ("He just wanted something that would work for his requested days off.").)

As for the second option, a leave of absence, it is not unreasonable to ask an employee to take unpaid leave while attempting to place him in another position. See Ansonia, 479 U.S. at 70 ("The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work.").[11] Yet, Werner could not guarantee a "NetOp" position would become available during a 30-day leave of absence – McKeel testified only that such positions came open "fairly often," possibly within two to four weeks. (McKeel Dep. at 78.) And if the 30-day leave expired without Maroko obtaining a "NetOp" job, his employment would have terminated. (Hoffman Dep. at 31-32.) Cf. EEOC v. Bridgestone/Firestone, Inc., 95 F. Supp. 2d 913, 917, 923 (C.D. Ill. 2000) (employer's offer of unpaid leave was reasonable accommodation where leave was repeatedly extended until alternative position was available).[12]

---

[11] Maroko cites to the contrary American Postal Workers Union v. Postmaster General, 781 F.2d 772 (9th Cir. 1986), but the Court declines to follow it in light of Ansonia.

[12] McKeel testified that an employee on a 30-day leave of absence could, theoretically, return to work before the leave of absence ended, "pull [one] load," and then be eligible to extend the leave for another 30 days (and for successive 30-day periods thereafter). (McKeel Dep. at 65-69.) There is no evidence this was ever considered here, however. In any event, the Court must view the record in the light most favorable to Maroko, and Hoffman testified that Maroko's leave could not be extended. (See Hoffman Dep. at 31 ("Q: [W]hat was to happen if after 30 days

In sum, the record suggests that Werner had alternatives available to it that would have eliminated Maroko's religion/work conflict, but it did not offer those alternatives to him. Instead, its proposed accommodation would have either required Sabbath work or, in the event of a leave of absence, raised the prospect of Maroko's termination if a "NetOp" position did not become available quickly. The Eighth Circuit has counseled that the reasonableness of a proposed accommodation often "is a question for the jury because it turns on fact-intensive issues such as work demands [and] the strength and nature of the employee's religious conviction." Sturgill, 512 F.3d at 1033; accord, e.g., EEOC v. Universal Mfg. Co., 914 F.2d 71, 73 (5th Cir. 1990) (*per curiam*) ("Ordinarily, questions of reasonableness are best left to the fact finder."); Haliye, 717 F. Supp. 2d at 881 ("What is 'reasonable' is difficult to boil down to a set formula. Instead, [it] is quintessentially a fact-bound inquiry that depends on the unique circumstances of each case."). The Court believes that is the case here – it simply cannot conclude, as a matter of law, that Werner's proposed accommodation was reasonable in light of its other available alternatives.

## IV.    Undue hardship

Although there are genuine issues whether Werner offered Maroko a reasonable accommodation, it can still prevail on its Motion by showing that accommodating his religious beliefs would have resulted in undue hardship. E.g., Jones, 319 F.3d at 359-60; Wilson, 58 F.3d at 1342. It has failed to do so, however.

---

there was not yet a position open in net ops? . . . Would his 30-day leave continue and be extended or what? A: No, his employment would end if he did not return after 30 days.").)

- 17 -

The thrust of Werner's undue-hardship argument is that Maroko "demanded" to work on the Tomah Account, yet insisted that he not work on the Sabbath. (Def. Mem. at 15.) According to Werner, it could not accommodate this request because Friday nights and Saturdays were the busiest times on the account, requiring every driver to work in order to timely complete all of Wal-Mart's deliveries. If Maroko were not working, argues Werner, it would have been required to hire an extra driver to cover his absence, imposing more than a *de minimis* burden (both financially and logistically). See Hardison, 432 U.S. at 84 ("To require [an employer] to bear more than a *de minimis* cost . . . is an undue hardship."); Harrell, 2011 WL 1166670, at *4 ("[A]n accommodation creates an undue hardship if it causes more than a *de minimis* impact on co-workers.").

As set forth above, however, there is a fundamental flaw in this argument: Maroko disputes that he "demanded" to work only on the Tomah Account. There is evidence in the record indicating that Maroko would have accepted "any other [position] open to work," including for example "an option that maybe [would require him to] to go New York." (Maroko Dep. at 85-86.) Kriutzfeld, one of *Werner's own witnesses*, confirmed that Maroko sought work "[o]n any account with the Sabbath off, not necessarily the Tomah account." (Kriutzfeld Dep. at 43.) And lest there be any doubt, Maroko made this crystal clear in his Affidavit:

> I did not tell Werner that I would refuse to be accommodated on some account other than the Tomah Account. Werner never even suggested to me that it could accommodate me on some other account. If Werner had suggested it could accommodate my Sabbath restriction on another account, but that [] would require me to be away from home on some Sabbaths or would require me to move to another city or another state, and if that was

- 18 -

>the only option Werner was giving me for accommodating my Sabbath restriction, I would have accepted that option.

(Maroko Aff. ¶ 22.)

Notably, Werner does not argue that any of Maroko's proposed accommodations *outside of the Tomah Account*, such as a transfer to the van division, would have imposed an undue hardship. Instead, its argument is wholly predicated on its claim that accommodating him on the Tomah Account would have done so. Because there is a genuine issue whether Maroko insisted upon working on that account, Werner's undue-hardship argument cannot carry the day.

## V.    Punitive damages

Finally, Werner argues that the Court should dismiss Maroko's request for punitive damages, for two reasons. It first contends that punitive damages cannot stand independently, and because Maroko's claims are subject to dismissal, so, too, is his punitive-damages request. (Def. Mem. at 17-18.) But this argument is a non-starter because there is a genuine issue whether Werner violated Maroko's rights, and hence his claims are not subject to dismissal at this juncture.

Werner's second argument fares no better. While recognizing that punitive damages are available under both Title VII and the MHRA, it asserts they are unrecoverable here because Maroko cannot show it acted with malice or deliberate indifference to his rights, as the statutes require. (See id. at 18-19; Reply at 11-13.) But Werner ignores that Magistrate Judge Graham, when deciding whether to grant Maroko leave to plead his request for punitive damages, already determined that there exists

sufficient evidence that the company acted in deliberate disregard of his right to be free from religious discrimination. (Doc. No. 47 at 3.) Werner could have appealed Judge Graham's Order to the undersigned but failed to do so, and the Court perceives no reason to revisit that Order now. In any event, the Court cannot say, as a matter of law, that if a jury were to credit Maroko's version of the facts, it could not find from those facts that the company deliberately disregarded his rights. While the Court remains skeptical that Maroko ultimately will be able to prove an entitlement to punitive damages, it will not dismiss his request for such damages now. See Haliye, 717 F. Supp. 2d at 883.[13]

## CONCLUSION

Whether an employer offered a reasonable accommodation or faced undue hardship ultimately "boils down to . . . whether the employer has acted reasonably." Beadle v. City of Tampa, 42 F.3d 633, 636 (11th Cir. 1995) (Gibson, J., sitting by designation) (citation omitted). Here, these questions cannot be answered as a matter of law at summary judgment. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Werner's Motion for Summary Judgment (Doc. No. 39) is **DENIED.**

Date: April 14, 2011   s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[13] This is not to suggest that Maroko's request for punitive damages, or any of his claims for that matter, will survive a motion for judgment as a matter of law at trial. In addition, the Court notes that the parties' briefs have raised the issue whether Maroko lied on his employment application with Werner; those (purported) misrepresentations have no bearing on the instant Motion. However, proof of such misrepresentations at trial may limit the universe of damages Maroko may recover. See McKennon v. Nashville Banner Publ'g Co., 513 U.S. 352, 361-62 (1995) (after-acquired evidence may limit damages of discriminated-against employee).